U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 3 0 2020

CLERK, U.S. DISTRICT COURT
By_____
        Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

LAWRENCE WHITE,                    §
                                   §
            Petitioner,            §
                                   §
v.                                 §        No. 4:19-CV-436-A
                                   §
LORIE DAVIS, Director,             §
Texas Department of Criminal       §
Justice, Correctional              §
Institutions Division,             §
                                   §
            Respondent.            §

**MEMORANDUM OPINION**
**and**
**ORDER**

This is a petition for a writ of habeas corpus pursuant to
28 U.S.C. § 2254 filed by petitioner, Lawrence White, who was
confined in the Correctional Institutions Division of the Texas
Department of Criminal Justice at the time the petition was
filed, against Lorie Davis, director of that division,
respondent. After having considered the pleadings, state-court
records, and relief sought by petitioner, the court has concluded
that the petition should be denied.

**I. FACTUAL AND PROCEDURAL HISTORY**

Petitioner was charged in Tarrant County, Texas, Case No.
1434087D, with possession of marihuana of five pounds or less but
more than four ounces. (Clerk's R. 6, doc. 11-11.) Following a
jury trial, the jury found him guilty, found the state-jail-
felony enhancement true, and assessed his punishment at 20 years'
imprisonment. (Id. at 111.) Petitioner appealed his conviction,

but the Second District Court of Appeals of Texas affirmed the
trial court's judgment and the Texas Court of Criminal Appeals
refused his petition for discretionary review. (Docket Sheet,
doc. 20-2.) Petitioner also filed a state habeas-corpus
application challenging his conviction, which was denied by the
Texas Court of Criminal Appeals on the findings of the trial
court. (SHR[1] 12-28 & Action Taken, docs. 20-19 & 20-22.) This
federal petition followed.

The state appellate court summarized the facts of the case
as follows:

> Maegan Parker, who managed the Cedar Ridge
> Townhomes on Knoll Crest Drive in Arlington, often
> visited the unit at 2130 Knoll Crest Drive not only
> because of her job duties but also because her
> mother-in-law lived next door. Parker deduced that
> [petitioner] lived at 2130 Knoll Crest Drive with the
> actual lessee, Laprecious Wheeler: she had seen him
> there frequently, and other tenants had complained
> about him over a period of time. Other people living at
> 2130 Knoll Crest Drive included Wheeler's mother
> (Ewanda Smith), Wheeler's children, Wheeler's uncle,
> and Wheeler's younger brother (T.P.).
>
> Over the Labor Day weekend in 2015, Parker saw
> [petitioner] leave the townhome, walk out to a vehicle
> in the parking lot, briefly talk to the vehicle's
> occupants, and go back into the residence. [Petitioner]
> repeated this pattern at least six times in a single
> hour. (Detective Andrew Van Treeck of the Arlington
> Police Department offered context for this kind of
> behavior, testifying that frequent, brief, and repeated
> traffic at a specific location often indicated drug
> trafficking.) Shortly afterward, on September 10,
> Parker made a complaint about [petitioner].

---

[1]"SHR" refers to the record of petitioner's state habeas proceedings in
WR-89,536-01.

Arlington P.D. Detective Spencer Simmons testified that after investigating a complaint about illegal narcotics activity at 2130 Knoll Crest Drive, he secured a search warrant for that address on September 24, 2015; the targets were [petitioner] and T.P.

Working undercover, Detective Van Treeck conducted surveillance on 2130 Knoll Crest Drive the next day, September 25, while other officers prepared to execute the search warrant. Detective Van Treeck parked his vehicle on an empty lot from which he could watch the door to the residence's patio area and could see [petitioner] sitting in a lawn chair about 12 feet in front of the townhouse. From that vantage point, [petitioner] had a good view of Arbrook Street's traffic.

Over the next several minutes, [petitioner] walked from the lawn chair into the townhouse and back again. On his last trip, he came out carrying a small child. With the child in his arms, [petitioner] walked westbound on the north side of Arbrook Street, crossed the street, then started walking southbound. As [petitioner] stood on the south side of Arbrook Steet, he made a telephone call while holding the child

Although [petitioner] was some distance away from Detective Van Treeck, [petitioner] intermittently stared at him. Because [petitioner] continued to look in Detective Van Treeck's direction as [petitioner] walked back to his residence, Detective Van Treeck grew concerned that his presence might have compromised the operation.

On returning to the townhome, [petitioner] took the child inside and came back out alone. Shortly after that, Detective Van Treeck saw a man walk up the drive and approach [petitioner]. They spoke briefly, and the man left.

The man who approached [petitioner] was Adam Colbert, a Tarrant County juvenile-probation officer. Colbert was there looking for T.P., one of his probationers, whom Colbert had been supervising for the past three months. Although Colbert had last visited T.P. at the Knoll Crest address on August 31, T.P. was not there for Colbert's multiple attempted follow-up visits. (Colbert was unable to find T.P. at 2130 Knoll

3

Crest Drive because after property manager Parker had
received a complaint on September 5, she had asked T.P.
to leave the property and had not seen him since then.)

Colbert recognized [petitioner]—who said T.P. was
not home—as Wheeler's boyfriend. Colbert asked
[petitioner] to "let [T.P.] know that [he] came by" and
to get in touch with Colbert as soon as possible.

After Colbert left, [petitioner] began to walk
around the townhome's patio area and returned to his
chair. From Detective Van Treeck's position, he could
see only [petitioner]'s back when [petitioner] turned
toward the patio, which was separated from the front
lawn by a wall that stood three or four feet high.

A photograph of the wall with officers standing
near it and behind it shows that it was roughly
bicep-level high. Another photograph shows that the
wall encloses a relatively small patio or front-porch
area. A large grill and a table within the enclosure
further reduce the already limited standing space
within the area.

As department policy required, a SWAT team served
the warrant. Officers encountered [petitioner] as he
sat in the lawn chair, and they detained him while
other officers searched the house and patio area. They
found marijuana in three different places: in the
barbecue grill on the patio, in the kitchen, and in a
bedroom.

Opening the grill's lid, officers discovered a
plastic shopping bag. Inside that shopping bag was a
clear zip-lock bag containing 224.81 grams (7.92
ounces) of marijuana—almost half a pound. Detective Van
Treeck testified that depending on the quality, eight
ounces of marijuana would have a street value from $100
to as much as $1,700. In a kitchen cupboard behind a
syrup bottle and other food items, officers found a
plastic baggie containing 1.11 grams of marijuana
(roughly .04 ounces). In a bedroom, the officers
uncovered another small baggie, this one containing .85
grams of marijuana, next to a video-game controller on
the floor beside the bed. A nearby canvas bag contained
documents and receipts with White's name on them.

Later that day, after the officers concluded the

4

search, Maegan Parker returned to the townhome to
secure a broken glass door. During the hour that she
was there working on the door, three or four people
approached her and asked to speak to "Head," which
Parker recognized as [petitioner]'s nickname. Each time
she told them that [petitioner] was not there, they
"just hurried up and got in their car and left."

(Mem. Op. 6-10, doc. 20-3.) Petitioner did not testify or call

any witnesses during the guilt/innocent phase of his trial.

## II. ISSUES

Petitioner claims that his constitutional rights were

violated in the following respects:

(1)   the trial court failed to order the state to
      divulge the identity of the confidential
      informant;

(2)   Detective Van Treeck gave false testimony;

(3)   he received ineffective assistance of trial
      counsel; and

(4)   the evidence was insufficient to support his
      conviction.

(Pet. 6-7, doc. 3.)

## III. RULE 5 STATEMENT

Respondent does not assert that the petition is successive

or time barred by the statute of limitations, but that one or

more of petitioner's claims are procedurally barred. (Resp't's

Ans. 5, doc. 19.)

## IV. STANDARD OF REVIEW

A § 2254 habeas petition is governed by the heightened

standard of review provided for by the Anti-Terrorism and

5

Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011); 28 U.S.C. § 2254(d)(1)-(2). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. It is the petitioner's burden to rebut the presumption of correctness through clear and convincing evidence. 28 U.S.C. § 2254(e)(1). *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000).

Furthermore, when the Texas Court of Criminal Appeals, the state's highest criminal court, denies relief without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Richter,* 562 U.S. at 100;

6

*Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court "should 'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* 138 S. Ct. 1188, 1191-92 (2018).

## V. DISCUSSION

### A. Identity of the Confidential Informant

Under his first ground, petitioner claims that the trial court erred by failing to order the state to divulge the identity of the informant upon his motion, in violation of his right to compulsory process and his "right to offer evidence as to his innocence" as guaranteed by the Sixth and Fourteenth Amendments.[2] (Pet. 6, doc. 3; Clerk's R. 43-44, doc. 20-13.) Respondent asserts that the claim is procedurally barred because petitioner defaulted the claim in state court. (Resp't's Answer 6-8, doc. 19.)

Under the procedural-default doctrine, federal courts are precluded from federal habeas review where the last state court to consider the claim raised by the petitioner based its denial

---

[2]To the extent petitioner claims a violation of the Texas Constitution, he fails to state a claim for federal habeas relief. Federal habeas relief lies only to rectify a violation of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).

of relief on an independent and adequate state-law procedural ground. *Coleman v. Thompson,* 501 U.S. 722, 729-30 (1991).

The state appellate court held that because the complaint made on appeal did not comport with the complaint made in the trial court, the claim was forfeited. (Mem. Op. 12-15, doc. 20-3.) Clearly, the state court's decision rested on a state-law procedural default independent of petitioner's claim. And, Texas's preservation rule is firmly established and regularly applied. *See Foster v. Johnson,* 293 F.3d 766, 790 (5th Cir. 2002); *Darden v. State,* 629 S.W.2d 46, 51 (Tex. Crim. App. 1982). Thus, the procedural default in state court precludes federal habeas review of the claim. *Wainwright v. Sykes,* 433 U.S. 72, 87, (1977); *Ogan v. Cockrell,* 297 F.3d 349, 356 (5th Cir. 2002).

A petitioner may overcome a state procedural bar by demonstrating either cause for the procedural default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice—*i.e.,* that he is actually innocent of the offense for which he was convicted. *Coleman,* 501 U.S. at 750. Such showing not have been made by petitioner, the claim is procedurally barred from this court's review.[3]

---

[3]And, although petitioner raised a claim sufficiently corresponding to the claim raised herein, in his state habeas application, the state habeas court found that the claim was not cognizable on state habeas review. (SHR 152, 157, doc. 20-22.) Thus, in the alternative, the claim is unexhausted for purposes of 28 U.S.C. 2254(b)(1).

## B. False Testimony

Under his second ground, petitioner claims that Detective Van Treeck testified falsely, in violation of the his due process rights under the Fifth and Fourteenth Amendments. (Pet. 6, doc. 3.) In support, petitioner asserts:

> Detective Van Treeck testified that some man approached me and it looked like he was delivering a package. Since he didn't no [sic] that that was a probation officer, Adam Colbert, he lied to make me look guilty. I had a baby with me when I talked to Mr. Colbert. Treeck stated that Colbert left and I kept pacing around the patio area where drugs were located in a grill, then the police came shortly thereafter. I had the baby when Colbert left, went in the house, put the baby down, came back outside and the police pulled up. Everything Treeck said after Colbert left was false. They had no evidence, so he made me look guilty. He filmed me fifty five minutes, so he should have known exactly what happened that day.

(Id.)

Petitioner raised his claim in his state habeas application and the state habeas court found that petitioner presented no evidentiary basis that Detective Van Treeck testified falsely or that his conviction was the result of false testimony. (SHR 144, doc. 20-22.) Based on its findings, and relying solely on state law, the court entered the following legal conclusions:

9. The State may not obtain a conviction through the use of perjured or false testimony.

10. Unknowing use of perjury or false evidence is considered a due process violation.

11. Inconsistent testimony goes to the credibility of the State's witnesses and does not establish the use of perjured or false testimony.

12.  It is the function of the jury as the trier of
     fact to resolve any conflict of fact and assign
     credibility to the witnesses.

13.  [Petitioner] has failed to prove that the State's
     witness testified falsely.

14.  [Petitioner] has failed to prove that the State
     presented false testimony.

15.  [Petitioner] has failed to prove that the State
     committed prosecutorial misconduct.

16.  [Petitioner] has failed to prove that he was
     denied due process at trial.

(SHR 153-54, doc. 20-22 (citations omitted).)

State law conforms with Supreme Court precedent on the issue
and the state court's decision is not contrary to or an
unreasonable application of that law or based on an unreasonable
determination of the facts in light of the record before the
state court.

A state denies a criminal defendant due process when it
knowingly uses perjured testimony at trial or allows untrue
testimony to go uncorrected. *See Giglio v. United States,* 405
U.S. 150, 154 (1972); *Napue v. Illinois,* 360 U.S. 264, 269
(1959). To establish a denial of due process through the use of
perjured testimony, a petitioner must show (1) that a witness for
the State testified falsely; (2) that such testimony was
material; and (3) that the prosecution knew that the testimony
was false. *Giglio,* 405 U.S. at 153-54.

Adam Colbert testified at trial that on the morning of the

10

raid, as he turned to leave the residence at 2130 Knoll Crest
Drive, petitioner crossed the street toward him holding a baby
and told him T.P. was not there. Colbert instructed petitioner to
have T.P. contact him and left. During Detective Van Treeck's
testimony, he testified that prior to the raid, he was conducting
surveillance of the residence, that he saw petitioner exit the
residence and cross the street holding a child and talking on a
cell phone. (Reporter's R., vol. 6, 44, 47, doc. 20-10.) He
testified that petitioner later crossed back over the street,
went inside the residence, and then reemerged. (Id. at 48.) The
following colloquy took place:

    Q.    All right. So when [petitioner] crossed back over
        and went inside, did he -- did you see him re-
        emerge from the house?

    A.    Yes I did.

    Q.    Did he have that child with him?

    A.    No, he did not.

    Q.    Okay. What else did you observe that morning?

    A.    Shortly after that, another individual did walk up
        the driveway and approach [petitioner]. And they
        had a brief conversation, and then that individual
        returned back northbound away from the driveway
        and was no longer in view.

    Q.    Okay.

    A.    I also -

    Q.    Let me stop you there, detective.
        Were you about to give the go ahead for the
        raid to begin?

11

A.   It was -- shortly after that, correct.

Q.   Okay. So some random person just walks up and
     starts talking to the person you have seen going
     in and out of the target structure on your search
     warrant?

A.   Correct.

Q.   Did it give you pause? Did you have pause or
     concern about that?

A.   Oh, yeah. I definitely didn't want this individual
     to be around before our tactical team made entry.

Q.   Ok. Do you recall what that person was dressed
     like?

A.   I really -- no, I really don't recall exactly what
     he was wearing.

Q.   Did that person's interactions from what you could
     see from your vantage point with [petitioner], did
     that give you any cause for concern?

A.   No, no. It didn't look suspicious. It could have
     been something to the effect of someone delivering
     something, like a package, or maybe someone within
     the complex was just speaking with this individual
     or speaking with [petitioner] in regards to --
     there was nothing that I would think related to
     what we had as the trafficking going on there.

Q.   Okay. And so that person has come and gone.

A.   He was just walking around the patio area of the
     location, and then he would just return back to his
     seated position in the white chair.

Q.   Okay. From your vantage point did you see him go onto
     the patio area?

A.   Not specifically onto it.  There's a wall there with a
     incut to allow people in there.  And, basically, from
     my view, anytime he was around it, all I could see was
     his back, so I couldn't see what was going on in front
     of him.

Q.   Okay.  But he was around that area?

A.   Yes, he was.

Q.   Did he go back inside?

A.   After that, if he did, it was maybe one more time. And
     then he returned back to his seated position in the
     white chair, and then our tactical unit did arrive
     shortly after.

(Reporter's R., vol. 6, 48-51.)

Beyond bare conclusory assertions, petitioner does not

suggest that he has any evidence to support his claim that

Detective Van Treeck testified falsely or that the state

knowingly used perjured testimony. *See Koch v. Puckett,* 907 F.2d

524, 531 (5th Cir. 1990). Although there were inconsistencies

between Colbert's and Van Treeck's testimony, it was up to the

jury to determine the weight to be given the testimony and to

determine matters of credibility. *Jackson v. Virginia,* 443 U.S.

307, 319 (1979). Furthermore, the discrepancy in their

testimonies was not substantial. Such minor inconsistencies in

testimony do not rise to the level of perjury, let alone prove

that the state knowingly used perjury. *Koch,* 907 F.2d at 531;

*Overton v. United States,* 450 F.2d 919, 920 (5th Cir. 1971).

## C. Ineffective Assistance of Counsel

Under his third ground, petitioner claims that he received

ineffective assistance of trial counsel. (Pet. 7, doc. 3.) A

criminal defendant has a constitutional right to the effective

assistance of counsel at trial. U.S. CONST. amend. VI, XIV;

13

*Strickland v. Washington*, 466 U.S. 668, 688 (1984). To successfully state a claim of ineffective assistance of counsel, the petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland,* 466 U.S. at 687. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Failure to establish either prong of the *Strickland* test will result in a finding that counsel's performance was constitutionally effective. *Id.* The petitioner bears the burden of proof on both components of the *Strickland* standard. *Id.* at 687. If the petitioner makes an insufficient showing on either component, the court need not address the other. *Id.* at 697.

Ineffective-assistance-of-counsel claims are considered mixed questions of law and fact and, therefore, are analyzed under the "unreasonable application" standard of § 2254(d)(1). *See Gregory v. Thaler,* 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated the ineffective-assistance claims on the merits, this court must review petitioner's claims under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011). In such

14

cases, the "pivotal question" for this court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable" or whether the state court's factual determination on which the decision was based was unreasonable in light of the evidence presented in the state-court proceedings. *See Richter,* 562 U.S. at 105; *Wood v. Allen,* 558 U.S. 290, 299 (2010).

Petitioner claims that his trial counsel Daniel L. Young was ineffective because he failed to—

(1)    file timely motions to suppress and to disclose the identity of the confidential informant;

(2)    interview state witnesses;

(3)    investigate mitigating evidence;

(4)    propose any additional basis for his motion(s);

(5)    object to the trial court's failure to conduct an in camera hearing; and

(6)    preserve error "in trial to conduct on a motion to reveal" the confidential informant.

(Pet. 7, doc. 3.)

Petitioner raised his claims, among others, in his state habeas application, which was referred to a magistrate judge for hearing, factual findings, and conclusions of law. (SHR 122, doc. 20-22.) Toward that end, the magistrate judge ordered an affidavit from trial counsel who responded to petitioner's allegations in a lengthy affidavit as follows:

15

## OVERVIEW

I was appointed to represent [petitioner] on November 17, 2015 for the charge of Possession of Marijuana, 4 oz. to 5 lbs., a State Jail Felony enhanced to second degree punishment (two to twenty years) based on two prior convictions For Robbery. The alleged offense date was September 25, 2015. On the day I was appointed, I requested discovery from the State and downloaded all available discovery through the county's ECFS discovery process. I spoke with [petitioner] by phone on December 2, 2015 after quickly reviewing his case material. [Petitioner] was charged with possessing a felony amount of marijuana found inside a grill on his girlfriend's (La Precious Wheeler's) outside porch. Wheeler had a single story apartment whose porch faced a fairly major street, but the porch and grill were hidden from street view by a brick wall about 4 feet high.

The initial conversation set the tone of the attorney-client relationship throughout my representation of [petitioner]. He was on bond while the case was pending. [Petitioner] was not going to take any kind of deal, and he claimed not to know that the marijuana was in the grill near where he had been seen at the time of the police raid and his arrest; no one could testify they saw him opening or closing the grill; the State could not prove possession; and he would not listen to or acknowledge the legal definition of possession (care, custody, control, or management). Indeed he seemed to focus on the facts that he was not holding the marijuana when arrested, it was not on his person, and no one could say they saw him put it in the grill. [Petitioner] never cared to be counseled nor listen to counsel about how the State may try to prove its case, and he rejected all offers that were made while fully aware of his punishment range. The State's offers ranged from six months State Jail, to four years TDC, then six months State Jail again, and finally ninety days Tarrant County Jail under 12.44(a) to State Jail possession-an offer that was extended twice. Indeed, when the ninety day offer was made, [petitioner] informed counsel that he was right to reject all offers, that my concerns were irrelevant, and that the fact that the State offered ninety days supported his belief that "he" had the State on the run. He arrogantly bragged that he would beat this case

16

just like he had a prior case. [Petitioner] did all of
the talking and none of the listening. As we neared
trial, [petitioner] informed me that the cops had no
legal right to arrest him because he was on private
property when arrested. I could never get him to
explain his proposition in more detail. Indeed before
the arrest, [petitioner] had been observed by the
police sitting in a chair that was located close to the
apartment door and the apartment porch in the yard;
then going to get a baby from the apartment and walk up
and down the sidewalk along the street in front of the
apartment, crossing to the far side of the street and
the re-crossing the street to return to the apartment;
and then returning the child inside and resuming his
place in the chair in the yard where he was sitting
when the police executed the warrant.

[Petitioner] would not make an appointment to come
to my office to review the material including, but not
necessarily limited to: photos, the police report,
audio recordings of his girlfriend, a video recording
of [petitioner]'s statement after his arrest, the
search warrant and affidavit, and the apartment
manger's [sic] drug complaint to the police that helped
spark an investigation to begin with. At every court
setting, I told [petitioner] he needed to come to my
office to review the case material and discuss strategy
in order to prepare for the next court setting. Court
settings at which I informed [petitioner] of the
necessity of reviewing his case in person occurred on
December 7, 2015; January 4, 2016; January 25, 2016;
February 16, 2016; and March 7 2016. On March 7, 2016,
the Court had our case on a short list for a possible
trial later in the month.

[Petitioner] made an appointment for 12:00 noon on
March 9, 2016. My office mate called me at 11:00 a.m.
the day of that appointment to tell me that
[petitioner] and a friend had arrived early at the
office in a green sedan. I had my office mate inform
[petitioner] that I was on my way from court and
hurried to the office as quickly as I could. I arrived
at 11:40 a.m. only to find that [petitioner] had
already left. When I called [petitioner], he said he
had to leave to go to his daughter's play, would have
to work the rest of the week, and he would have to call
me back.

My investigator and I had called LaPrecious
Wheeler, [petitioner]'s girlfriend, on March 6, 2016.
Despite that fact that she was to be a defense witness,
Wheeler would not give my investigator her current
address where she lived with her mother and children.
She informed us over the phone that she and
[petitioner] were no longer together; that she was
inside the house at the time of the raid; that
[petitioner] was about one-half way across the street
when the cops kicked in the door; that there was no
marijuana in the house although the cops claimed to
have found such in the kitchen and a bedroom; that the
only marijuana found was in the grill; that
[petitioner] did talk to an Adam Colbert, Wheeler's
brother's juvenile probation officer, who arrived and
left shortly before the raid; and that the apartment
manager, Ms. Parker, was always on her ass but she was
not sure why. She never said anything about anyone
leaving marijuana in the house from the night before
the raid or about her putting it in the grill outside
before the raid. She had also told the police at the
time of the raid that she knew about the marijuana
found in the bedroom, that it belonged to [petitioner],
and that he-but not she-smoked it, and that he was at
her place almost every day.

The case was not reached for trial in March 2016,
but was reset for a Status Docket on April 4, 2016 with
trial to start on April 11, 2016.

On April 4, 2016 [petitioner] and his girlfriend
finally came to my office for the first and only
meeting before trial. At that one meeting, he denied
that a misdemeanor amount of marijuana was found in the
house despite his admitting to the cops in his recorded
interview that he thought he was arrested for the
misdemeanor amount of marijuana found in the bedroom.
According to [petitioner] at the April 4 meeting, the
cops lied about and planted the marijuana found in the
house, despite many photos showing the cops finding
marijuana in the kitchen and a bedroom. At the meeting,
[petitioner] was not interested in and did not review
his recorded statement, photos, or other parts of the
file. At that meeting the girlfriend, Ms. Wheeler,
informed me that [petitioner] was at the apartment the
night before he was arrested. From what I understood,
he went home in the evening at some point to return the
next morning. Such was consistent with what she had

earlier told the cops.

[Petitioner] was not worried about impeachment
with his prior convictions, apparently confident that
he could put everything in its proper perspective for
the jury if he took the stand. He wanted to know why my
investigator had not contacted him. I know that she had
tried more than once. When I asked what she needed to
do or what he needed to tell her, [petitioner] informed
that such was my job to figure out. He did not like my
pre-trial motions (not sure why). He was not worried
about the apartment manger [sic], a Ms. Parker, who
made a complaint to the police about watching him sell
dope out of Ms. Wheeler's apartment to people passing
on the street that the porch faced. Nor was he worried
about Ms. Parker complaining that [T.P.], Ms. Wheeler's
younger brother, and [petitioner] had supposedly been
seen with a gun and were involved in a confrontation
using a gun with other people who lived in nearby
apartments. In [petitioner]'s mind, whatever Ms. Parker
had to say had nothing to do with proving that he was
in possession of marijuana on the day of his arrest.
Similarly, [petitioner] was not concerned about the
alleged confidential informant who allegedly made a
controlled buy from [petitioner] at Wheeler's apartment
and was the primary basis for the search warrant.

Throughout the case, [petitioner]'s preferred
method of conversing about his case was by phone,
preferably by text messaging. I told him such was not
workable. At one point, [petitioner] texted me wanting
me to file a motion to dismiss the case for lack of
evidence. Shortly before trial, he texted me wanting to
know what would happen if someone came and testified it
was their marijuana in the grill, not [petitioner]'s.
[Petitioner] never informed me who such a person might
be, but I surmised he was referring to his girlfriend
Wheeler. I told him that it would be up to a jury to
believe or not believe such testimony, but that before
such a person would be allowed to testify to committing
a felony the Court would appoint an attorney to
represent the person and advise him of his rights. I
saved the text message and it is still available.

Counsel appreciates that the above information
about trying to meet with [petitioner] and conduct a
meaningful review of his case is more detail than a
dime should buy, but it is illustrative of the

difficulty counsel had working with [petitioner] and the nature of the attorney-client relationship. In [petitioner]'s view, the attorney was just a useless appendage. Also, the detail recounted points to counsel's suspicion that making notes regarding counsel's efforts was the prudent course to follow at the time.

Counsel filed pre-trial motions that were heard on Friday, April 8, 2016. When I arrived at court on that date, I met [petitioner] in the hallway. He informed me that Wheeler was downstairs at the D.A.'s office talking to a Detective. I believe at that time [petitioner] informed me that Wheeler was giving a statement to the effect that she found the marijuana in the house while cleaning up and put it in the grill outside. This was the first time I had ever heard the story. I informed the Court of the situation, and the Court had me go to the D.A.'s office and bring Wheeler to the courtroom. Although Wheeler had previously been sworn in as a defense witness (on March 14, 2016), she did not want to come to the courtroom to talk to the judge about the possible appointment of an attorney to advise her. I was careful not to discuss what she was going to say to the Detective, but explained that the Court wanted to talk to her before she gave a statement to determine whether the Court needed to appoint her an attorney. She accused me of pulling some "sneaky shit."

While in the courtroom waiting for the judge, Wheeler walked out. [Petitioner] said Wheeler was going to hire her own attorney and did not want a court-appointed attorney. The Court ended up appointing an attorney to advise and counsel Wheeler. She ended up claiming her 5th Amendment privilege not to testify after conferring with her counsel.

During the course of the trial, Wheeler's attorney informed both me and the Court that Wheeler had decided to waive her 5th Amendment privilege and testify. This was on April 11, 2016, the Monday voir dire was to begin. I had not talked to Wheeler over the weekend because last I saw her she was sailing under a flag of privilege. Wheeler's attorney called her for me to make sure she was wanted to testify and listened as she told me what she was going to testify to on the stand. She was going to testify that she found the dope while cleaning up the children's bedroom. She called her

20

brother, [T.P.], who was over at her house the night
before with a friend. [T.P.] told Wheeler that his
friend must have left the marijuana at the house and
that she needed to put it in the grill. Wheeler claims
that she did as her brother instructed; [petitioner]
never knew the marijuana was in the grill and was not
at her house the night before the raid. Wheeler had
previously told me and the cops that [petitioner] was
at her house the night before; indeed, in a recorded
interview she told an officer that [petitioner] was at
her house almost everyday of the two months they had
been dating.

If I remember correctly, trial testimony started
Tuesday, April 12, 2016. I asked Wheeler to wait for me
after court, but she and [petitioner] left without
waiting for me to talk to them. When I telephoned her
later that evening to talk to her in more depth, I got
a convoluted and different story than what she first
told me and her attorney after waiving her 5th. She had
not called her brother when she found the marijuana in
the bedroom. She put the marijuana (with a lab weight
of a little less than 1/2 a pound) in the grill with
the intention of throwing it away, but the police
arrived before she had a chance to dispose of the dope.
Wheeler vacillated as to whether [petitioner] was at
her apartment the night before the raid. As I was
talking to Wheeler on the phone, I could hear kids
screaming in the background and a male voice talking to
her. The male voice sounded to me as if it were
coaching Wheeler as to what to say. I could not tell if
it was [petitioner]'s voice.

I had previously checked out [T.P.]'s (Wheeler's
brother) history. At the time of [petitioner]'s trial,
[T.P.] had pending a Possession of a Penalty Group 1
(under a gram) in the 297th District Court of Tarrant
County. The offense date for the possession offense was
November 11, 2015, about six weeks after [petitioner]'s
offense date. He evidently received a deferred
probation (later revoked) on April 12, 2016. During
[petitioner]'s trial [T.P.] also had pending two other
misdemeanor charges from November 11, 2015: a
possession of marijuana and an unlawful carrying of a
weapon. Also pending during [petitioner]'s trial were
[T.P.]'s misdemeanor charges of theft from October 2015
and his Family Violence Assault case from September
2015. Also, on [petitioner]'s offense date and just

momentarily before the raid leading to [petitioner]'s arrest, Adam Colbert, a juvenile probation officer, had shown up at Wheeler's apartment looking for [T.P.] with a directive to apprehend.

On April 13, trial testimony continued with the State's case in chief. Wheeler had still recanted her 5th Amendment privilege to testify and was sitting out in the hallway until (and if) called. In front of the jury, as a State's witness was testifying on the stand and my attention was focused on the witness, a bailiff reached over and took [petitioner]'s cell phone from him that he had been holding in his lap while sending text messages. It turned out that he had been texting Wheeler out in the hallway as to what she should testify to. Admittedly, I was fed up with the [petitioner]/Wheeler antics at this point. Wheeler, understandably, reasserted her 5th Amendment privilege to remain silent.

Guilt/innocence was argued to the jury. Following my advice, [petitioner] did not take the stand. In the last ten years he had a number of convictions, many within the ten-year look back period for impeachment: two misdemeanor convictions for possession of marijuana, two felony convictions for robbery, one State Jail conviction for Possession of a Controlled Substance under one gram, and one State Jail conviction for delivery of marijuana 4 oz. to 5 lbs. Going back further in his past, [petitioner] had convictions from as early as 2000 including an assortment of six prior misdemeanors and another felony robbery conviction. In his video taped interview with the police, [petitioner] bragged on how he used to sell crack. He had too much baggage and none of the temperament to take the stand.

As best as I recall, the jury was out several hours before finding [petitioner] guilty. [Petitioner] was upset and assured me that the only reason he was found guilty was that I kept him off the stand. He was determined to testify before the jury at his punishment hearing on April 14, 2016. On the record, against his lawyer's advice, [petitioner] voiced his determination to testify. He did so. It was a tornado of a mistake on [petitioner]'s part. Counsel several times objected to his own client's non-responsive answers to the State's cross; objections that were promptly overruled. Counsel remembers one exchange in which [petitioner]

22

volunteered during cross that the State railroaded him
into a conviction on the current case, just like it had
in his prior robbery convictions. During argument on
punishment, the State asked for ten years in prison.
The jury did not follow the State's recommendation and
returned a maximum verdict of twenty years.
[Petitioner] simply could not be saved from himself.

### RESPONSE TO PETITIONER'S ALLEGATIONS
(Not Necessarily in Order Raised in Petition)

COUNSEL FAILED TO CONDUCT ADEQUATE PRE-TRIAL
INVESTIGATION

COUNSEL FAILED TO INTERVIEW POTENTIAL WITNESSES

COUNSEL FAILED TO INTERVIEW EYEWITNESSES

COUNSEL FAILED TO INVESTIGATE THE RELEVANT FACTS
AND CIRCUMSTANCES

COUNSEL FAILED TO CONTACT WITNESSES

COUNSEL FAILED TO SUBPOENA WITNESSES

COUNSEL SCARED MS. WHEELER SO AS TO PREVENT HER
FROM TESTIFYING

COUSNEL FAILED TO INTERVIEW THE POLICE OFFICERS
PRE-TRIAL

COUNSEL FAILED TO INVESTIGATE AN ALIBI WITNESS

COUNSEL FAILED TO INVESTIGATE WHETHER MEGAN PARKER
HAD ANY CRIMINAL RECORD THAT COULD BE USED TO IMPEACH
HER

COUNSEL FAILED TO INVESTIGATE THE EXISTENCE OF
VIDEO FOOTAGE

I conducted as much pre-trial investigation as
possible without the client's help and without the help
of his girlfriend, Ms. Wheeler. As noted above,
[petitioner] would not really discuss the case or
strategy. He did tell me that the testimony of Adam
Colbert, a juvenile probation officer who arrived at
Wheeler's apartment very shortly before the execution
of the arrest warrant, would set him free. Colbert, per

his trial testimony, arrived at Wheeler's apartment
just moments before the bust looking for Wheeler's
brother, [T.P.]. He did see [petitioner] walking around
outside the apartment carrying a baby. He talked to
[petitioner] briefly (evidently they recognized one
another because Colbert had been to the apartment
before looking for [T.P.]), and [petitioner] informed
him that [T.P.] was not at the apartment. Colbert said
he left and did not know that a raid had taken place
until the next week when he talked to Wheeler. At
trial, a surveillance officer for the entry team
testified that he saw a man who turned out to be
Colbert approach the apartment and then leave. Shortly
thereafter, the police executed the warrant. The
surveillance officer described seeing [petitioner]
holding a baby, walking down the sidewalk in front of
the apartment with the baby, looking at the officer's
unmarked car that was parked across the street from the
apartment on a side street, crossing the street,
walking in front of the surveillance car, crossing the
street again and walking back to the apartment.
[Petitioner] never gave me a clear story as to why
Colbert could testify to anything that would definitely
set him free. At one time he told me Colbert saw
[petitioner] arrive at the apartment, that he and
Colbert talked across the street from the apartment,
etc. Colbert's testimony certainly did not indicate
such.

    Colbert, as a juvenile probation officer, was
reluctant to testify, especially for the defense.
Considerable time was spent and multiple attempts were
made to contact him by phone and interview him. Colbert
did not want to talk to the defense and tried to have a
prosecutor simply pass on what he had to say. Finally,
I talked to Colbert by phone; a D.A. was listening on
Colbert's side and my investigator was listening on my
side. Colbert told us that when he arrived at the
apartment, [petitioner] was across the street holding a
baby. [Petitioner] came across the street to tell
Colbert that [T.P.] was not at home. Although Colbert
said he did not need a subpoena for trial, he had to be
placed under subpoena by the defense when the defense
could not make contact with him shortly before trial.
His testimony, in my opinion, neither really helped nor
hurt.

    My investigator interviewed Ms. Parker, the

24

apartment manger [sic]. Parker started gushing forth, with no reference to any notes, the problems she had with Wheeler, her tenant, as well as [petitioner] and Wheeler's brother, [T.P.]. Parker claimed to have watched [petitioner] engage in multiple transactions selling dope (6 or 7 in just one day) where he would walk out of the apartment to cars that stopped, make a transaction, and go back inside. She also said others had complained that [petitioner] and [T.P.] had both been seen with a gun and had been involved in some sort of confrontation with a group of other tenants. At trial she testified she was very well aware of the activity with Wheeler's apartment because Parker had an elderly parent who lived in an apartment adjoining Wheeler's. My investigator did photograph the area involved in the case. I also did so separately while reviewing the scene and the patio area in relation to the street, etc. My investigator tried talking to [petitioner], but he would not return her calls.

My investigator and I both went over the case, and my investigator checked the criminal histories of any potential civilian witnesses that we thought might be relevant. Parker, the manager, was upset with Wheeler not only because she was letting [petitioner] hang around selling dope, but also because Wheeler had her mother, Ewanda Smith, living with her and the mother was not on the lease. Supposedly the only people on the lease were Wheeler and several of her kids. Smith, Wheeler's mother, had a record, and the discovery material contained what appeared to be Facebook photos of Smith and [T.P.], Wheeler's brother, flashing gang signs. As noted above, [T.P.]'s criminal record was investigated. I asked Wheeler to have her mother give me a call, but she never did.

I carefully reviewed all of the discovery provided, including but not limited to many photos taken at the time of the raid (several showing the chair [petitioner] had supposedly been seen sitting in between the apartment door and the accessible patio with the grill), Parker's complaint that initiated the investigation, the search warrant and supporting affidavit for the previous controlled buy, the police report, two audio interviews of Wheeler by the police, several reviews of [petitioner]'s recorded video interview with the police, lab results, the police documentation summarizing the informant's buy

25

(absent informant's name of identification), etc.
[Petitioner] never gave me any more names to run down
or check out other than Colbert and [T.P.].
[Petitioner] never told me that the marijuana belonged
to [T.P.], but he simply surmised that it could have
been [T.P.]'s dope. Indeed, per [petitioner] the
marijuana could have belonged to anyone because the
patio and grill were accessible to anyone walking by.
Finally, I reviewed [petitioner]'s criminal history and
tried to prepare some mitigation evidence, but
[petitioner] provided none. He was supposedly working
somewhere, but I never knew where for sure. Given
[petitioner]'s extensive criminal history and his
failure to cooperate with his attorney, I simply had no
solid mitigation evidence to present.

Finally, I prepared pre-trial motions, which were
heard the Friday before trial, with the ruling on
several being carried over until the following Monday.
Most of the motions were granted on Friday, including
the State's agreement to provide defense with the
criminal histories of any of it civilian witnesses
(including [T.P.]). The Court carried until Monday, the
day of voir dire, its decision on defense's motion to
reveal the identity of the confidential informant,
defense's motion to suppress the search warrant based
primarily upon an unreliable informant, and defense's
motion to suppress the video portion of [petitioner]'s
statement to the police based on the fact that the
police interviewed [petitioner] while wearing the same
hoods that they were wearing at the time of the
execution of the warrant. Counsel also shared with the
State the time periods at which the audio portion of
[petitioner]'s statement should be silenced because of
irrelevant and prejudicial comments by [petitioner] and
his interviewers. As best as I remember, the State did
not play the recording of the statement before the
jury.

Pre-trial investigation was as thorough as
possible. Counsel tried to make contact with all
civilian witnesses likely to testify or have anything
to say. Wheeler had been sworn in, but she claimed her
5th Amendment and had given a number of highly
inconsistent statements.

Parker, the manager, was interviewed by my
investigator who also checked Parker's criminal

history. Moreover, during the pre-trial hearing, the State (having access to TCIC and NCIC data bases) agreed to notify me of the criminal history of any civilian witnesses who had priors that could be used for impeachment. To the best of my memory, none, including Parker, did have such criminal histories.

Colbert was, after much effort, interviewed and put under subpoena. Ewanda Smith, Wheeler's mother who was inside the apartment at the time of the bust, would never call me after I told both [petitioner] and Wheeler I wanted to talk to her, but I also had no indication that she had anything to add to Wheeler's inconsistent statements. Also, whatever she might say would be undercut by her criminal history and gang affiliation. [Petitioner] never hinted at or gave me any information as to an alibi witness (I'm not sure what he means by said accusation because he was certainly present when the warrant was executed).

I never scared or tried to scare Wheeler off the stand. I had her sworn in during one of the regular court settings, and the appointed attorney, not me, evidently counseled her into taking the 5th Amendment. I did bring her to court when it became known that she was trying to give a statement to the State so that she could be appointed an attorney if needed. I had responded to one of [petitioner]'s texts shortly before trial as to the procedure for a witness who wanted to confess guilt at trial. Wheeler waived her 5th Amendment privilege on her own, and then reasserted it when [petitioner] was caught texting her during the middle of trial. Indeed, I thought all along that [petitioner] was trying to get Wheeler to admit it was her marijuana because she had less legal exposure that [sic] he did. I also thought she was worried about implicating herself in a felony because she had a number of young children for whom she was responsible. She had told the police that she had no idea that [petitioner] or anyone else was dealing marijuana out of her apartment.

Counsel did not interview the police officers involved in person, but he did have the police reports that gave a detailed account and photos that documented the police's finding the marijuana in the grill, in the kitchen, and in a bedroom. There were also photos of a bag belonging to [petitioner] that contained a number

27

of his personal documents that was found in a bedroom. From the reports, the photos, the search warrant affidavit, and the recorded statements, defense was well aware of what the police were going to testify to. Finally, during the pre-trial hearing, the State confirmed that there was no video to be disclosed other than [petitioner]'s recorded statement that had already been made available to the defense.

COUNSEL FAILED TO TIMELY FILE THE MOTION TO REVEAL CONFIDENTIAL INFROMANT [sic]

COUNSEL FAILED TO TIMELY FILE THE MOTIONS TO SUPPRESS

COUNSEL FAILED TO PROPOSE ANY ADDITIONAL BASIS FOR HIS MOTIONS

COUNSEL FAILED TO OBJECT TO THE TRIAL COURT'S FAILURE TO CONDUCT AN IN CAMERA HEARING

Pre-trial motions were filed about one month before trial, including a motion to reveal the identity of the confidential informant who made a controlled buy that, in turn, the police used to obtain a search warrant. The search warrant affidavit, dated September 24, 2015, states that a confidential informant bought marijuana from [petitioner] within the last seventy-two hours at the same address as Wheeler's apartment. It also notes that the informant knew [petitioner] by the name of "Head" and describes how the buy was made. Nothing indicates and I never had any indication that the informant was present at, or had been present at the apartment the next day when the warrant was executed. [Petitioner] never told me who the informant was, that he and the informant had ever known one another, and never admitted to making a sell to anyone. Although the Court overruled my motion to force the State to reveal the identity of the informant, I simply had no information to present further reasons as to why the informant's identity was necessary to test his reliability, or why his testimony would be material to guilt/innocence when he was not present on the day of [petitioner]'s arrest.

A motion to suppress the warrant was filed close to trial, and it was based primarily on the argument that the informant was not reliable, but I had no one

to put on the stand to question or impeach the informant's reliability.

Both the motion to reveal the informant's identity and the motion to suppress were presented at the pre-trial hearing the Friday before trial, but the Court did not rule on the motions until the following Monday, the day of voir dire. The Court wanted to take the motions under advisement as well as my motion to suppress the video portion of [petitioner]'s recorded statement. The State and I both agreed to allow the Court to review a copy the recorded statement over the weekend; the Court did so; and on Monday the Court granted defense's motion regarding the video portion of the recording because the interviewing detectives wore hoods throughout the interview. [Petitioner] offers no reason as to why or how the timing of the motions was detrimental to his case, or how he was harmed by the lack of an in camera interview of the informant when I really had no basis upon which to attack the informant's reliability.

I understand that [petitioner] takes exception to the Court's rulings on the motion to reveal the informant's identity and the motion to suppress the search, but he offers no indication now, and offered none to me at the time, to further press the issue of the informant's reliability.

A guilty verdict was not a foregone conclusion in [petitioner]'s case, but he did nothing to help his attorney and did nothing in regard to reviewing his case and discussing strategy with his attorney. He was adamant that Colbert's testimony would set him free when, obviously, it would not. Indeed, [petitioner] acted as if he and Colbert were on very friendly terms. [Petitioner] would not listen to his attorney or even consider his attorney's advice. He kept his best defense witness off the stand by putting her in a position where she decided to invoke her 5th Amendment. He was caught in front of the jury trying to text Wheeler in the middle of trial and was fortunate that the State did not try to file a witness-tampering case. Finally, directly against his lawyer's advice, [petitioner] took the stand during the punishment phase of the trial. His attitude, demeanor, and credibility impressed the jury so much that the jury returned a maximum verdict of twenty years when the State only

29

> asked for ten. During the entire time of my
> representation, [petitioner] made it clear that he was
> in charge.
>
>     Counsel was as effective as possible, and
> certainly as effective as his client would allow.

(SHR 60-74, doc. 2-22.)

Petitioner filed an "affidavit" in response to counsel affidavit, however, based on the record and counsel's affidavit, which the magistrate judge found to be credible, the magistrate judge entered findings of fact, too numerous to list here, consistent with counsel's testimony. (Id. at 123-31, 144-51.) Based on those findings, and applying the *Strickland* standard, the magistrate judge entered the following legal conclusions:

23. Counsel's motion to reveal the confidential informant was timely.

24. Counsel's motions to suppress were timely.

25. [Petitioner] has failed to prove that there were additional bases for his motions that counsel should have presented.

26. [Petitioner] has failed to prove that counsel's representation was deficient because he did not object to the lack of an in camera hearing.

27. Counsel's pre-trial investigation was the result of reasonable trial strategy.

28. [Petitioner] has failed to prove that there were witnesses available for counsel and his investigator to interview that were not interviewed.

29. [Petitioner] has failed to prove that he had alibi witnesses that were not interviewed.

30. [Petitioner] has failed to prove that the defense

team failed to try to contact witnesses.

31. Counsel's decision to not interview the police
officers was the result of reasonable trial
strategy.

32. [Petitioner] has failed to prove that counsel
should have subpoenaed more witnesses.

33. [Petitioner] has failed to prove that there was
video footage counsel failed to discover.

34. Counsel properly investigated Ms. Parker.

35. Counsel's investigation for mitigation evidence
was the result of reasonable trial strategy.

36. [Petitioner] has failed to prove that trial
counsel's representation fell below an objective
standard of reasonableness.

37. A party fails to carry his burden to prove
ineffective assistance of counsel where the
probability of a different result absent the
alleged deficient conduct "sufficient to undermine
confidence in the outcome" is not established.

38. "[A] court need not determine whether counsel's
performance was deficient before examining the
prejudice suffered by the defendant as a result of
the alleged deficiencies. The object of an
ineffectiveness claim is not to grade counsel's
performance. If it is easier to dispose of an
ineffectiveness claim on the ground of lack of
sufficient prejudice, which we expect will often
be so, that course should be followed."

39. [Petitioner] has failed to show that the result of
the proceeding would have been different had
counsel filed motions earlier[.]

40. [Petitioner] has failed to show that the result of
the proceeding would have been different had
counsel raised additional bases in his motions.

41. [Petitioner] has failed to show that the result of
the proceeding would have been different had
counsel objected to the lack of an in camera

hearing.

42.  [Petitioner] has failed to show that the result of
     the proceeding would have been different had
     counsel conducted more investigation.

43.  [Petitioner] has failed to show that the result of
     the proceeding would have been different had
     counsel attempted to interview more witnesses.

44.  [Petitioner] has failed to show that the result of
     the proceeding would have been different had
     counsel subpoenaed more witnesses.

45.  [Petitioner] has failed to show that the result of
     the proceeding would have been different had
     counsel investigated Ms. Parker more.

46.  [Petitioner] has failed to show that the result of
     the proceeding would have been different had
     counsel investigated more for mitigation evidence.

47.  [Petitioner] has failed to show that there is a
     reasonable probability that, but for the alleged
     acts of misconduct, the result of the proceeding
     would have been different.

48.  [Petitioner] has failed to prove that he received
     ineffective assistance of trial counsel.

(Id. at 154-57 (citations omitted).)

The state habeas judge, who also presided at petitioner's

trial, adopted the actions of the magistrate judge and, in turn,

the Texas Court of Criminal Appeals denied habeas relief on the

trial court's findings. (Id. at 161; Action Taken, doc. 20-19.)

Petitioner has not presented clear and convincing evidence

to rebut the state courts' factual findings. Thus, deferring to

those findings, including the state courts' credibility

determinations, as this court must, the state courts' application

32

of *Strickland* was not objectively unreasonable under the
doubly-deferential standard applied to such claims. Petitioner's
claims are largely conclusory, with no factual or legal basis,
refuted by the record, involve strategic and tactical decisions
made by counsel, and/or involve matters of state law, all of
which generally do not entitle a state petitioner to federal
habeas relief. *See, e.g., Strickland,* 460 U.S. at 689 (holding
strategic decisions by counsel are virtually unchallengeable and
generally do not provide a basis for postconviction relief on the
grounds of ineffective assistance of counsel); *Evans v. Cockrell,*
285 F.3d 370, 377 (5th Cir. 2002) (providing a petitioner must
"bring forth" evidence, such as affidavits, from uncalled
witnesses in support of an ineffective-assistance claim); *Green
v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998) (providing
"[m]ere conclusory allegations in support of a claim of
ineffective assistance of counsel are insufficient to raise a
constitutional issue"); *United States v. Green,* 882 F.2d 999,
1003 (5th Cir. 1989) (providing "[a] defendant who alleges a
failure to investigate on the part of his counsel must allege
with specificity what the investigation would have revealed and
how it would have altered the outcome of the trial"). Even if
petitioner could demonstrate ineffective assistance of counsel in
one or more respects, which he has not, having reviewed the
record in its entirety, he cannot possibly establish

33

prejudice—*i.e.*, that but for counsel's acts or omissions there is a reasonably probability that he would have been acquitted or that his sentence would have been significantly less harsh.

A petitioner shoulders a heavy burden to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985). Clearly, petitioner was an extremely uncooperative client and counsel's investigation and overall representation was frustrated by that fact. *See Strickland*, 466 U.S. at 691 (providing information supplied by client critically affects reasonableness of investigation). It is difficult to fault counsel when the client is uncooperative.

### D. Sufficiency of the Evidence

Lastly, under his fourth ground, petitioner claims that the evidence was insufficient to affirmatively link him to the contraband. (Pet. 7, doc. 3.)

A criminal defendant has a federal due process right to be convicted only upon evidence that is sufficient to prove beyond a reasonable doubt the existence of every element of the offense. *Foy v. Donnelly*, 959 F.2d 1307, 1313 (5th Cir. 1992). Federal courts, nevertheless, have extremely limited habeas review of claims based on the sufficiency of the evidence. *Lucas v. Johnson*, 132 F.3d 1069, 1078 (5th Cir. 1998). As with an

ineffective-assistance-of-counsel claim, a sufficiency-of-the-evidence challenge to a state conviction must overcome a doubly-deferential standard of review. *Parker v. Matthews,* 567 U.S. 37, 43 (2012). When reviewing such claims, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). The review remains the same whether the evidence is direct or circumstantial. *United States v. Richardson,* 848 F.2d 509, 511 (5th Cir. 1998). And, where a state appellate court has conducted a thoughtful review of the evidence, its determination is entitled to great deference and may not be overturned on federal habeas review unless the decision was objectively unreasonable. *Cavazos v. Smith,* 565 U.S. 1, 3-4 (2011).

Applying the *Jackson* standard, and relevant state law, the state appellate court addressed petitioner's claim as follows:

> A person commits the state-jail-felony offense of marijuana possession if he knowingly or intentionally possesses a useable quantity of the drug in an amount between four-plus ounces and five pounds. To prove unlawful possession, the State must establish that the accused exercised care, control, or management over the contraband and knew that the substance was in fact contraband.
>
> The State may prove these elements through direct or circumstantial evidence, but the evidence must establish that the accused's connection with the substance was more than merely fortuitous. In other words, mere presence in the same place as the

controlled substance will not support a possession finding.  But presence or proximity, when combined with other evidence, either direct or circumstantial, may establish possession.

Possession also need not be exclusive. When a defendant is not in exclusive possession of the place where the substance is found, additional independent facts and circumstances must exist linking him to the contraband. Texas courts have recognized a non-exclusive list of circumstances tending to establish affirmative links that will support an inference of possession, including:

- the defendant's presence when a search was conducted;

- whether the contraband was in plain view;

- the defendant's proximity to and the accessibility of the contraband;

- whether the defendant was under the influence of narcotics when arrested;

- whether the defendant possessed other contraband when arrested;

- whether the defendant made incriminating statements when arrested;

- whether the defendant attempted to flee;

- whether the defendant made furtive gestures;

- whether an odor of contraband existed;

- whether other contraband or drug paraphernalia was present;

- whether the defendant owned or had the right to possess the place where the drugs were found;

- whether the place where the drugs were found was enclosed;

- whether the defendant was found with large amounts of cash;

• whether the defendant's conduct indicated a
consciousness of guilt.

It is the logical force of all direct and
circumstantial evidence and not the number of links
that is dispositive. A corollary principle is that the
absence of various affirmative links does not
constitute evidence of innocence to be weighed against
the affirmative links that do exist.

. . .

[Petitioner] argues that no drugs were found on
him or within his reach. Although true that no drugs
were discovered actually on [petitioner], nearly eight
ounces of marijuana were found in the patio grill close
to where [petitioner] was sitting. No one other than
[petitioner] was seen on or near the patio.

The fact that the residence was home to other
adults and children is similarly not determinative
because a defendant's possession need not be exclusive.
Furthermore, none of the other adults or children were
seen on the patio near the grill containing the
concealed marijuana, and none of the other adults or
children were seen shuttling back and forth between the
residence, the patio, and vehicles in the parking lot
as [petitioner] was.

And although T.P.'s alleged possession of
marijuana also formed a basis for the search warrant,
the evidence at trial was that after Parker asked T.P.
to leave, she had not seen him at the property since
September 5. In addition, Colbert's attempts to visit
T.P. later in September and, specifically, on September
25, 2015, failed, thus further undercutting any
suggestion that the marijuana might have belonged to
T.P. rather than [petitioner].

[Petitioner] also suggests that we find it
significant that he was not inside the townhouse when
the officers conducted the search. But the officers
found the vast majority of the marijuana on the patio,
which was precisely where Detective Van Treeck had seen
[petitioner]. Additionally, Parker testified that she
thought [petitioner] lived there, and other evidence
supported Parker's belief. The officers found documents
with [petitioner]'s name on them in the bedroom—a room

37

in which the officers found more marijuana. They found
a third bit of marijuana hidden away
in a common area—a kitchen cabinet.

[Petitioner] maintains, too, that no evidence
showed how the marijuana got into the grill or that he
had any control over the grill. Although no direct
evidence showed who put the marijuana into the grill,
testimony at trial placed a street value on it of as
much as $1,700. The jury could reasonably conclude that
whoever put it there would not leave it unattended.
[Petitioner] was the only person in a position to watch
the grill. And because the grill was behind a partial
wall, the jury could have reasonably concluded that
[petitioner] could have accessed the grill without
being seen. Indeed, Detective Van Treeck testified that
[petitioner] moved around the patio area without
Detective Van Treeck's being able to tell what
[petitioner] was doing because of the wall.

Viewing the evidence in the light most favorable
to the verdict, the State introduced sufficient
evidence linking [petitioner] to the contraband found
at the townhouse. Viewed in the light most favorable to
the verdict, the combined and cumulative force of all
the evidence, and the reasonable inferences that can be
drawn from it, also established that [petitioner]
exercised care, custody, and control over at least four
ounces of the contraband found there. Any rational
factfinder could have found the essential elements of
the crime beyond a reasonable doubt.

(Mem. Op. 2-12, doc. 20-3 (citations and footnote omitted.)

The state court applied the correct legal standard as

determined by the Supreme Court and its decision is reasonable in

light of the evidence at petitioner's trial. Direct evidence is

not required; each element may be inferred from a "collection of

circumstances." *United States v. Fuchs,* 467 F.3d 889, 908 (5th

Cir. 2006). The fact that the evidence in petitioner's case was

mostly circumstantial does not mean that it is insufficient or

that it will not support a verdict. *United States v. Ochoa,* 609

F.2d 198, 203 (5th Cir. 1980).

## V. CONCLUSION

For the reasons discussed herein,

The court ORDERS that petitioner's petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby,

denied. The court further ORDERS that a certificate of

appealability be, and is hereby, denied, as petitioner has not

made a substantial showing of the denial of a constitutional

right or that reasonable jurists would question the court's

procedural ruling.

SIGNED June **30**, 2020.

JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE